**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Northern Division*

| | | |
|---|---|---|
| | * | |
| FLO PAC, LLC, | | |
| | * | |
| Plaintiff, | | |
| | * | Case No. WDQ-09-510 |
| v. | | |
| | * | |
| NUTECH, LLC, | | |
| | * | |
| Defendant. | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

This Memorandum and Order addresses Plaintiff Flo Pac, LLC's Motion to Compel Answer to Deposition Question, ECF No. 47; Defendant NuTech, LLC's Brief in Opposition to Plaintiff's Motion to Compel, ECF No. 48; Plaintiff's Reply to Defendants' Opposition to Motion to Compel, ECF No. 51; Plaintiff's Letter Amending its Reply, ECF No. 52.[1]  A hearing was held on November 23, 2010.  ECF No. 54. For the reasons stated at the hearing and discussed herein, Plaintiff's motion is GRANTED.  This Memorandum and Order disposes of ECF Nos. 47, 48, 51, and 52.

## I.    BACKGROUND

Flo Pac is a limited liability company "engaged in the selling of hydronic balancing valves, coil connection devices, and related products for commercial HVAC [heating,

---

[1] On January 12, 2010, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302, Judge Quarles referred this case to me to resolve discovery disputes and related scheduling matters. ECF No. 35.

ventilation, and air conditioning] applications." Compl. ¶ 1, ECF No. 1. Its owner is Richard Brady, who also owns its parent company, Meleney Equipment, Inc., and Meleney Equipment's other subsidiary, PTV Enterprises, Inc. *Id.* at ¶ 4 n.1. According to Defendants, NuTech is a design, development, and manufacturing company, formed in 2003 with the "purpose of producing its own line of specialty valves for the HVAC market," and Defendant Cliff Kratz is its managing member and co-founder. Defs. NuTech & Vaught's Answer, Aff. Defenses & Countercl. ¶ 6, ECF No. 19. Defendants claim that NuTech contracted with Flo Pac in January 2003 "to distribute valves that NuTech designed and produced." March 30, 2009 Mem. Op. 1 (citing Hr'g Tr. at 31-40), ECF No. 15; *see* Answer ¶¶ 80-139. According to Plaintiff, although "NuTech contends that it manufactured a line of specialty valve products for use in the HVAC industry, and Meleney marketed and distributed those products," in Flo Pac's view, NuTech "never manufactured *anything*" and "was merely Flo Pac's agent to obtain the subject valves"— which were Flo Pac's product—"from a factory in China." Pl.'s Ltr. Am. 1 (emphasis in letter).

In its Complaint, Flo Pac alleged, *inter alia*, Lanham Act violations against NuTech, Kratz, Jeffrey Vaught, and ten unnamed individuals, regarding the production and distribution of brass and steel valves used in HVAC systems. Compl. ¶¶ 2-6. The valves at issue are the subject of a 2003 patent application (" '067 Application") and a 2005 patent (" '317 Patent"), which named Flo Pac owner Brady and Defendant Vaught as the inventors. Pl.'s Reply 3. Vaught and Brady were represented by attorney Gregory Gore in 2003 regarding the '067 Application and '317 Patent. Pl.'s Reply Ex. A; Defs.' Opp'n 10. It is undisputed that Vaught, now a NuTech employee, was a Flo Pac employee at that time and until late June 2008. Compl. ¶ 16. However, Vaught emailed Kratz graphics and other Flo Pac property while he was employed by Flo Pac. *Id.* ¶ 22, Ex. C, E. Plaintiff asserts that when the patent was issued to

Vaught and Brady, the inventors assigned it to PTV Enterprises, and then ultimately to Flo Pac. Compl. ¶ 16. Defendants contend that Vaught and Brady did not conceive of the subject matter claimed in the '317 Patent and that Kratz[2] was wrongfully and intentionally omitted from the '067 Application and '317 Patent. Answer ¶¶ 68-79. Additionally, Defendants claim that Kratz, acting as a representative of NuTech, retained Gore in early 2003 to discuss patenting the same valve design on NuTech's behalf. Kratz 2d decl. ¶ 11.

Prior to co-founding NuTech in 2003, Kratz was an employee of a company named Flow Design, Inc. In August 2006, Flow Design raised patent infringement claims against Flo Pac with regard to the '317 Patent. Kratz 2d decl. ¶ 3, ECF No. 48-1. Flow Design sent Flo Pac a letter "alleging that in distributing NuTech's valve products, Flo Pac was infringing a patent held by Flow Design." Pl.'s Reply 3. Flo Pac shared the letter it received from Flow Design with NuTech because "the interests of both Flo Pac and NuTech were potentially threatened by Flow Design's claim." *Id.* Kratz, on behalf of NuTech, and Vaught, who was a Flo Pac employee at the time, met with Gore in August 2006 about Flow Design's claim against Flo Pac and Kratz's concerns that Flow Design might file suit against NuTech as well. Pl.'s Mot. 2. Flo Pac claims that "Mr. Vaught attended the meeting on behalf of Flo Pac." Pl.'s Mot. 2. Defendants claim that "Mr. Vaught was asked by NuTech to attend the August 2006 conference as [its] *consultant*, not as an agent of Flo Pac." Defs.' Opp'n 10 (emphasis added). However, at the November 23, 2010 hearing, Defense counsel could not identify an evidentiary basis for that claim. On the record before me, Vaught was neither paid by nor retained by NuTech. Defendants state that "Mr. Vaught had knowledge of the PTV design, knowledge of the HVAC assemblies in which

---

[2] Defendants also claim that two other individuals, George Vonhof and Bill Edmonds, were intentionally omitted from the '067 Application and '317 Patent. However, their involvement is not relevant to the present dispute.

the PTV was installed, and ready access to sample HVAC assemblies with which the PTV valve was used," and "assist[ed] attorney Gore's understanding of the related technology field." *Id.* The communications made during the August 2006 meeting are what Plaintiff seeks to discover in its Motion to Compel, and what Defendants contend are protected by the attorney-client privilege.

Plaintiff deposed Defendant Vaught on September 28, 2010. Pl.'s Mot. 1. During the deposition, when Plaintiff's counsel asked Vaught questions concerning his conversation with Gore during the August 2006 meeting, Vaught's counsel objected, asserted the attorney-client privilege, and instructed Vaught not to answer the questions. *Id.* Plaintiff seeks "an order compelling witness Jeffrey Vaught to respond to questions concerning his dealings with an attorney known as Gregory Gore" as well as "the reasonable costs of pursuing this motion." *Id.* at 5.

## II.    PARTIES' CONTENTIONS

Plaintiff contends that "[n]o privilege could attach to the meeting between [Vaught], Kratz, and Gore," or at least not "one that would preclude [Plaintiff] from inquiring about its representative's communications with that attorney." *Id.* at 2. Plaintiff argues that it, with Vaught as its agent, was one of Gore's clients during the meeting and therefore, the attorney-client privilege could not "bar it from discovering the extent of its own attorney's efforts on its behalf." *Id.* at 4. In the alternative, Plaintiff argues that even if Vaught was not Gore's client during the meeting, his presence as Flo Pac's representative was that of a third-party, such that the attorney-client privilege was waived as to the communications at the meeting, "as well as any privilege that might be asserted to matters arising out of that which was discussed at the meeting." *Id.*

Defendants argue that Vaught did not constitute a "third-party" or "stranger" during the meeting and therefore, his presence did not waive the attorney-client privilege. *Id.* at 9. According to Defendants, even though Vaught was employed by Plaintiff at the time of the meeting, Kratz asked him to attend the meeting because of his extensive knowledge of the design at issue, and therefore he was present as a "consultant" to Defendant NuTech and not as an agent or representative of Plaintiff. *Id.* at 10. Alternatively, they contend that the meeting related to the joint defense of Defendant NuTech and Plaintiff against Flow Design's claims, such that the privilege could not be waived without the consent of all parties that share the privilege. Defs.' Opp'n 11-13. In their view, even if Vaught attended the meeting as Flo Pac's agent, because the meeting "solely involved a common legal interest, *i.e.*, defense of the patent infringement allegations of Flow Design," the meeting invoked the joint defense privilege exception to third party waiver. *Id.* at 11.

In its Reply, Plaintiff insists that "[n]either logic nor the facts support" Defendants' assertion that "when an employee of Flo Pac attended a meeting with patent attorney Gregory Gore *specifically for the purpose of discussing the allegations Flow Design had made against Flo Pac*, Flo Pac had nothing to do with that meeting," and its employee attended only as an agent of Defendant NuTech. Pl.'s Reply 4. Moreover, Plaintiff argues that "the common interest rule has no application to the instant dispute," because it applies, if at all, to disclosures to third parties, but does not bar the parties sharing the common interest from discovering the communication. *Id.* at 5.

## III.    ANALYSIS

The starting point for asserting a privilege properly is Fed. R. Evid. 501. Rule 501 provides that, for claims and defenses for which federal law applies, federal common law

governs privilege, unless the Constitution, federal statutory law, or the Federal Rules provide otherwise. Fed. R. Evid. 501. Conversely, when State law "supplies the rule of decision" for an element of a claim or defense, the privilege "shall be determined in accordance with State law." *Id.* The challenge arises when both federal and state substantive laws apply (e.g., because the case poses a federal question and presents supplemental state law claims) and federal and state privilege laws differ. *See Cont'l Cas. Co. v. Under Armour, Inc.*, 537 F. Supp. 2d 761, 767 n.3 (D. Md. 2008). Under these circumstances, "Rule 501 would seem to require that federal privilege law control the federal claims, and state privilege law control the supplemental state law claims." *Id.* Yet, "the majority of courts have held that federal privilege trumps state law," and applies to all claims, "because were it otherwise, the jury would be faced with a hopelessly confusing task." *Id.* (collecting cases).

Here, Plaintiff's case poses a federal question based on the Lanham Act, as well as supplemental state law claims. Thus, federal privilege law applies, and Defendants had the burden of establishing the existence of a recognized evidentiary privilege under federal privilege law. *See* Fed. R. Civ. P. 26(b)(5)(A); *Vellone v. First Union Brokerage Servs.*, 203 F.R.D. 231, 235 (D. Md. 2001). Defendants met this burden by asserting the attorney-client privilege, "one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)); *see Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 606 (U.S. 2009) (same); *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) (recognizing attorney-client privilege). The purpose of the attorney-client privilege is "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swindler & Berlin*, 524 U.S. at 403 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

The Fourth Circuit adopted the "classic test for application of the attorney-client privilege" as set forth in *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950):

> The [attorney-client] privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact to which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (per curiam) (quoting *United Shoe*); *see United States v. Lentz*, 524 F.3d 501, 523 (4th Cir. 2008) (quoting *Jones*).   Put another way,

> [F]our elements are required to establish the existence of the attorney-client privilege:
>
> (1) A communication;
>
> (2) made between privileged persons;
>
> (3) in confidence;
>
> (4) for the purpose of seeking, obtaining, or providing legal assistance to the client.
>
> Besides the existence of these elements, the privilege must be affirmatively raised and cannot have been waived.

Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 65 (5th ed. 2007) (quoting *Restatement, The Law Governing Lawyers* § 118 (Tentative Draft No. 1, 1988)); *see United States v. Cohn*, 303 F. Supp. 2d 672, 683 (D. Md. 2003); *Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 37 (D. Md. 1974).   In applying these elements, courts have narrowly construed the attorney-client privilege.   *NLRB v. Harvey*, 349 F.2d 900, 907 (4th Cir. 1965) ("'The privilege remains an exception to the general duty to disclose. . . . It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation for truth.   It ought to be strictly confined within the narrowest possible limits consistent with the logic of its

principles.'") (quoting 8 J. Wigmore, *Evidence* § 2291, at 554 (McNaughton rev. ed. 1961)). The client, as the holder of the privilege, *Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998), has the burden of proof. *See Jones*, 696 at 1072.

### A. Communication between privileged persons

For the attorney-client privilege to apply, there must have been a communication between privileged persons, i.e., one who "is or sought to become a client" and that person's attorney or the attorney's subordinate acting in the attorney's stead. *See Jones*, 696 F.2d at 1072. The privilege applies to the client's communications to the attorney, as well as the attorney's communications to the client. *See Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 375 (4th Cir. 2009) ("the privilege 'protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."'" (quoting *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 291 (4th Cir. 2004) (quoting *Upjohn*, 449 U.S. at 390))). With regard to the attorney's "subordinate," courts have extended a derivative privilege to retained professionals who assist the attorney to better understand the facts in providing competent legal advice to the attorney's client. *See, e.g.*, *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) ("[T]he complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others; few lawyers could now practice without the assistance of . . . aides of other sorts.").

Here, Plaintiff seeks to discover the communications among Gore, Vaught, and Kratz. It is undisputed that Gore is an attorney and Vaught had been his client in 2003. Pl.'s Mot. 1-2 & n.1; Defs.' Opp'n 1. Further, it is evident that Gore corresponded with Kratz in 2003 with regard to the '317 Patent application, suggesting that he also represented Kratz at that time. Pl.'s Reply Ex. A, ECF No. 51-1. Also, it is apparent from Gore's file that he represented Flo Pac as late as

October 1, 2007. *Id.* The record is far from clear regarding Gore's capacity in August 2006; it appears that Gore represented everyone for every purpose. According to Plaintiff, Vaught attended the meeting with Gore as a client, on Plaintiff's behalf,[3] with regard to a possible patent infringement claim, such that both were privileged persons. Pl.'s Mot. 2. Defendants counter that Vaught attended the August 2006 meeting at Kratz's request, as a "consultant" to NuTech, which Gore also represented, and "Mr. Kratz requested attorney Gore's advice and opinion regarding Flow Design's infringement allegation," such that Kratz also was a privileged person. Defs.' Opp'n 9. Regrettably, neither Plaintiff nor Defendant, who had the burden of proof, deposed Gore or sought an affidavit from him on the subject, which would have been illuminating. In either case, Gore was communicating with someone who either was or sought to be his client, such that it was a communication between privileged persons, and the communications would qualify as communications for purposes of the attorney-client privilege. *See Rein*, 553 F.3d at 375.

### B. Seeking, obtaining, or providing legal assistance

For communications between an attorney and his or her client to be privileged, they must have been made primarily for the purpose of obtaining legal advice or services from the attorney. *Upjohn Co.*, 449 U.S. at 389; *In re Grand Jury Proceedings (John Doe)*, 727 F.2d 1352, 1355 (4th Cir. 1984). As with all other elements of the attorney client privilege, the scope of the privileged communication is a narrow one. *In re Grand Jury Proceedings*, 727 F.2d at 1355. This Court determines whether a communication is protected by the attorney-client privilege by inquiring into the "primary purpose" of the communication and considering the specific context

---

[3] The attorney-client privilege applies when a corporate employee, at the corporation's officers' behest, communicates with the corporation's attorney. *See Upjohn Co. v. United States*, 449 U.S. 383, 394-95 (1981).

in which the communication was made. *Cohn*, 303 F. Supp. 2d at 683 (citing *Jones*, 696 F.2d at 107); *see Neuberger Berman Real Estate Income Fund, Inc.* v. *Lola Brown Trust No. 1B*, 230 F.R.D. 398, 410-11 (D. Md. 2005) (stating that the district's "primary purpose" test was consistent with the Fourth Circuit's "but for" test, which requires privilege claimants to demonstrate that the communication would not have taken place but for the need for legal advice). For example, in *Cohn*, 303 F. Supp. 2d at 685, this Court held that documents reviewed by both attorneys and accountants were not afforded protection by the attorney-client privilege. It reasoned that "'[i]f the document was prepared for purposes of simultaneous review by legal and nonlegal personnel, it cannot be said that the primary purpose of the document is to secure legal advice.'" *Id.* (quoting *United States* v. *IBM Corp.*, 66 F.R.D. 206, 213 (S.D.N.Y. 1974)).

Here, although it is unclear whether Vaught attended the meeting at Kratz's request or on Flo Pac's behalf, it is clear that either Vaught, Kratz, or both sought Gore's advice with regard to a possible patent infringement claim, and therefore the meeting was primarily for the purpose of obtaining legal advice. *See* Pl.'s Mot. 2; Defs.' Opp'n 9. Thus, it is clear that there was a communication between client and attorney for the purpose of obtaining legal advice. Whether the attorney-client privilege protects the communication at issue turns on whether Defendant has carried its burden of showing that the communication was made in confidence and not waived.

### C. Confidentiality

The attorney-client privilege only protects attorney-client communications that are confidential. *See Cohn*, 303 F. Supp. 2d at 683; Epstein, *supra*, at 65; *see also Jones*, 696 F.2d at 1072 (the privilege only applies to communications made "without the presence of strangers"). Put another way, it protects "communications not intended to be disclosed to third persons other than in the course of rendering legal services to the client or transmitting the communications by

reasonably necessary means." *United States v. (Under Seal)*, 748 F.2d 871, 874 (4th Cir. 1984). Thus, "if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information . . . will not enjoy the privilege." *Id.* at 875; *see In re Grand Jury Proceedings*, 727 F.2d at 1356 ("The essence of the privilege is the protection of what was expressly made confidential or should have been reasonably assume[d] . . . by the attorney as so intended.") (internal quotation marks omitted). Even if the communication is confidential when it is made, it is not a privileged communication if the underlying information is not intended to remain confidential. *See In re Grand Jury Subpoena*, 341 F.3d 331, 336 (4th Cir. 2003); *In re Grand Jury Proceedings*, 727 F.2d at 1358 (stating that, absent any intent that the information was to remain confidential, the strict construction of the attorney-client privilege dictates that information intended to be published is not protected); *Burlington Indus.*, 65 F.R.D. at 33 (holding that communications between attorney and his client relating to preparation of a patent application were not protected by the attorney-client privilege because the "confidential information" would have to be disclosed to the patent office).

Here, regardless of whom Gore represented, a third party was present, which negated any purported intent to keep the communication confidential.[4] *See Jones*, 696 F.2d at 1072; *United States v. (Under Seal)*, 748 F.2d at 874-75. If Gore represented Vaught, then Kratz's presence suggests that Vaught did not intend to prevent disclosure of the communication. Similarly, if Gore represented Kratz, then Vaught's presence suggests that Kratz did not intend to maintain the confidentiality of the communication. *See Jones*, 696 F.2d at 1072; *United States v. (Under Seal)*, 748 F.2d at 874-75.

---

[4] As discussed *infra*, if the third party were an agent of the attorney or client, then the confidentiality of the communication could be maintained as to third parties who were not present at the meeting. As to the participants in the meeting, it is just plain silly to suggest that the communication could be kept confidential from someone who was present for its utterance.

At first blush, the third party's presence not only undermines any argument that Defendants intended to maintain the confidentiality of the communication, but also introduces the possibility of waiver.[5]   However, waiver occurs when a privileged communication is disclosed to a third party at a later date.  *Fed. Elec. Comm'n v. Christian Coalition*, 178 F.R.D. 61, 71 (E.D. Va. 1998) As the court explained in *Federal Election Commission*, 178 F.R.D. at 71 (internal citations omitted):

> Third party disclosure has two effects on the attorney-client privilege. If the communication between attorney and client takes place in the presence of a third party, and that third party hears the communication contemporaneously with its being made, then the attorney-client privilege for that information never existed. . . .

> If, on the other hand, the communication took place in private, between the attorney and the client alone, then the privilege comes into existence at the time the communication occurred. Subsequent disclosure to a third party then waives the privilege . . . .

> Thus, it is technically proper to speak of waiver only in the case where the attorney or client communicates the privileged information to a third party after the privilege has come into existence. If the third party is present when the communication is made, it is not technically correct to say that the client has "waived" the privilege because one cannot waive what never existed.

*See* Epstein, *supra*, at 390; *see also Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 488 (2000) ("The attorney-client privilege evaporates upon any voluntary disclosure of confidential information to a third party. The privilege can be waived by the client or prospective client only

---

[5] An otherwise-applicable attorney-client privilege will not protect a communication between an attorney and a client if the privilege has been waived.  *Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998); *Jones*, 696 F.2d at 1072. Among the several waivers of the attorney-client privilege is the third-party waiver, under which an attorney-client communication is not protected if the client knowingly discloses the confidential information in the presence of a non-privileged third party.  *Hawkins*, 148 F.3d at 384 n.4; *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1350 (Fed. Cir. 2005); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003). Such disclosure constitutes an implied waiver of the privilege because it "vitiates the confidentiality that constitutes the essence of the attorney-client privilege." *Hawkins*, 148 F.3d at 384 n.4 (collecting cases).   The party asserting privilege has the burden of establishing that it did not waive the privilege. *See In re Grand Jury Subpoena*, 341 F.3d at 335.

if the communication is *later* disclosed to a third party and the client either did not wish to keep the materials confidential or the client did not take adequate steps in the circumstances to prevent the disclosure of the privileged communication.") (citations and quotation marks omitted) (emphasis added).   Here, the disclosure occurred concomitantly with the communication. Therefore, to the extent that the third party's presence impacts the privilege, it does not waive the privilege after it attaches, but rather negates the confidentiality element and prevents the communication from ever being deemed confidential, at least as between the participants of the meeting, and as to Flo Pac, which Vaught represented.

### 1. Third party as agent

Defendants argue that Vaught's presence as a third party did not vitiate the confidentiality of the communication because Vaught attended the meeting as a "consultant" to Defendant NuTech (even though he was employed by Plaintiff at the time) to "assist attorney Gore's understanding of the related technology field."   Defs.' Opp'n 10.   It is true that an otherwise-privileged communication remains privileged, despite the presence of a third party, "'[i]f the purpose of the third party's participation is to improve the comprehension of the communication between attorney and client.'" *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 141 (S.D.N.Y. 2007) (quoting *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999)).   However, the privilege only applies "if the services performed by the non-lawyer are *necessary* to promote the lawyer's effectiveness."   *In re N.Y. Renu with Moistureloc Product Liab. Litig.*, 2008 WL 2338552, at *7 (D.S.C. 2008) (emphasis added) (noting that "the court in *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) held that confidential communications to non-lawyers could be protected by the privilege if the non-lawyer's services are necessary to the legal representation").   Put another way, the communication is privileged if the third party's presence "was necessary to

clarify, facilitate, or improve an attorney's comprehension of the facts on which a legal opinion will be given or a client's comprehension of the attorney's opinion," so that the client could "obtain informed legal advice." Epstein, *supra*, at 264.

A third party's presence is "necessary" when "some 'arcane' information must be transmitted," and the third party acts "as an "interpreter" of a language, be the language verbal or technical." Epstein, *supra*, at 264. The circumstances under which a third party's presence is "necessary" are limited, as "the extension of the privilege to non-lawyer's communication is to be narrowly construed." *NXIVM Corp.*, 241 F.R.D. at 141. Thus, a communication with a third party "does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). Rather,

> [t]he involvement of the third party must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications. Mere convenience is not sufficient.
>
> . . . The issue is whether the third party's presence materially facilitates and improves the attorney-client communication process, or whether it is a mere convenience. If the former, the third party's presence should not vitiate the availability of the privilege. If the latter, the privilege will be deemed breached by the presence of the unnecessary third party.

Epstein, *supra*, at 264.

The third party may be present at the attorney's or the client's behest. *See United States v. Evans*, 113 F.3d 1457, 1462 (7th Cir. 1997) ("[A]s a general matter, the attorney-client privilege will not shield from disclosure statements made by a client to his or her attorney in the presence of a third party who is not *an agent of either the client or attorney*.") (emphasis added); 8 Wigmore, *Evidence* § 2311 ("One of the circumstances by which it is commonly apparent that the communication is not confidential is the presence of a third person who is not *the agent of*

14

*either client or attorney*.") (emphasis added); *see also Smith v. Trans Am Trucking, Inc.*, 2008 WL 943368, at *3 (W.D.N.C. 2008) (concluding that "'[t]he presence of a third party will not vitiate the attorney/client privilege if the third party is *the client's agent*'") (emphasis added) (quoting defendants' filing). *But see* Epstein, *supra*, at 261 ("Generally, any presence of third parties who are not *agents of the attorney* and present for the purpose of assisting the attorney in giving legal advice destroys the confidentiality which is a prerequisite for the attachment of the privilege *ab initio*.") (emphasis added). Further, a third party present at the client's request need not be the client's employee. *See In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir. 1994) (holding that "disclosure of otherwise privileged documents" to the client's agent, an independent contractor, "did not destroy the privilege"); *Energy Capital Corp.*, 45 Fed. Cl. at 491, 492 (holding that "[i]n appropriate circumstances, a person may share information received from its attorney with third parties and not waive the attorney-client privilege that would otherwise exempt that information from discovery," but "[n]ot every independent contractor qualifies for this special protection."); *Scott Paper Co. v. United States*, 943 F. Supp. 489, 499 (E.D. Pa.), *aff'd*, 943 F. Supp. 501 (E.D. Pa. 1996) (stating in dicta that "the privilege extends to those communications between the attorney and all agents or employees of the organization [claiming privilege] who are authorized to act or speak for the organization in relation to the subject matter of the communication."). It is noteworthy that the cases extending the privilege to third parties who are not employees of the client suggest that the third party should be paid and retained by the client, or at least be party to a more formal agreement to represent the party when speaking with the attorney for the privilege to apply. *See In re Bieter Co.*, 16 F.3d at 937 (referring to "independent contractors"); *Energy Capital Corp.*, 45 Fed. Cl. at 491, 492 (same); *see also Scott Paper Co.*, 943 F. Supp. at 499 (referring to agents "who are authorized to act or speak for the organization in relation to the

subject matter of the communication"). Moreover, "[a] detailed factual showing is necessary to establish the relationship between the client and a third party that is sought to be included within the protection of the attorney-client privilege." *Energy Capital Corp.*, 45 Fed. Cl. at 492.

While there is conflicting evidence whether Vaught attended the August 2006 meeting on behalf of Flo Pac, it does not appear, based on the record before me, that Vaught attended the meeting on behalf of NuTech. *Compare* Pl.'s Mot. 2 *with* Defs.' Opp'n 10. Additionally, although Defendants claim that Vaught tried to "assist attorney Gore's understanding of the related technology field," Defs.' Opp'n 10, specifically "the differences between Flow Design's combination ptv and NuTech's PTV," *id.* at 7, Defendants have not substantiated their claim that Vaught was present as a "consultant" of NuTech  As noted, an affidavit from or deposition of Gore would have clarified the facts, but neither party offered either. When asked to characterize Vaught's relationship with NuTech, Defense counsel stated that Vaught was a named inventor on the '317 Patent and that he worked for Flo Pac and Meleney. Defense counsel also said that Vaught testified in his deposition that, at the time of his meeting with Gore and Kratz, he was an employee of Meleney who worked for PTV, which became Flo Pac. None of these statements establish a relationship between Vaught and NuTech or Vaught's role as a consultant. To the contrary, it is clear that if Vaught appeared on behalf of NuTech, it was Kratz who requested Vaught's presence; he was not hired by NuTech or the attorney. *See* Defs.' Opp'n 10 ("On his own initiative, Mr. Kratz requested that Mr. Vaught attend the conference."). Thus, Defendants have not made the factual showing necessary to establish Vaught's relationship with NuTech, especially given that, at the time of the August 2006 meeting, Vaught was an employee of NuTech's competitor, Flo Pac. *See Energy Capital Corp.*, 45 Fed. Cl. at 492.

Moreover, Defendants have not demonstrated that Vaught's presence was necessary. *See In re N.Y. Renu with Moistureloc Product Liab. Litig.*, 2008 WL 2338552, at *7; Epstein, *supra*, at 264. Indeed, Defendants claim that Kratz was one of the "true inventors" of the PTV and was "fully aware of its design and functionality." *Id.* This allegation, as well as Kratz's level of knowledge as a former Flow Design employee, undermine Defendants' argument that Vaught's presence was "necessary" to explain the '317 Patent to Gore. In Defendants' counterclaim, they further allege that Vaught was improperly named as an original inventor on the '317 Patent and that he did not "conceive of any subject matter claimed in the '317 Patent." Answer ¶¶ 76, 80-92. It is manifestly contradictory for Kratz to first allege that he was the original inventor and therefore had a full understanding of the invention's design and functionality yet later claim that he truly needed the presence and expertise of Vaught, a non-inventor, at the 2006 meeting in order to help Gore understand the design. Additionally, Gore filed the patent application in 2003, which required his familiarity with the technical details of the device to be patented, and he was familiar with patents and patent law, as well as intimately familiar with the '317 Patent. In these circumstances, it is hard to imagine that Vaught's presence was necessary to Gore's understanding of the issues discussed at the August 2006 meeting.

It seems to be "simply straining too far" to claim, as Defendants do, that the presence of Flo Pac's employee at the meeting between attorney Gore and Defendant NuTech's president did not negate the confidentiality element of attorney-client privilege and prevent the communication from ever being deemed confidential. *See Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F.3d 120, 125 (4th Cir. 1994) ("The assertion of a claim of privilege for information turned over to the other side . . . is simply straining too far. . . . Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege."); *see*

*also Jones*, 696 F.2d at 1072; *United States v. (Under Seal)*, 748 F.2d at 874-75.  Therefore, on the record before me, Defendant failed to meet its burden of establishing every element of the attorney-client privilege because it did not establish that the communication was confidential. *See Jones*, 696 F.2d at 1072.

## 2. *Common interest rule*

Relying on the common interest rule, Defendants argue in the alternative that Vaught's presence as a third party did not vitiate the confidentiality or the privilege because Vaught and NuTech, the client, shared a common legal interest in defending against potential litigation by Flow Design.

> Described "'as an extension of the attorney client privilege,'" the common interest doctrine applies when two or more parties consult or retain an attorney concerning a legal matter in which they share a common interest. In this context the communications between each of the clients and the attorney are privileged against third parties, and it is unnecessary that there be actual litigation in progress for this privilege to apply.

*Hanson v. U.S. Agency for Int'l Dev*., 372 F.3d 286, 292 (4th Cir. 2004) (internal citations omitted). Thus, the common interest rule is "an exception to the general rule that no attorney-client privilege attaches when confidential communications are communicated in the presence of or to third parties." Epstein, *supra*, at 274.  It originated in the criminal law context, as a "joint defense privilege" for "co-defendants whose attorneys shared information in the course of devising a joint strategy for their clients' defense." *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 248-49 (4th Cir. 1990) (citing *Chahoon v. Commonwealth*, 62 Va. (21 Gratt.) 822 (1871)).  More recently, it has been extended to the civil arena, where it is commonly referred to as the "common interest rule." *Id.* at 249; *Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 2010 WL 3945107, at *4 (E.D.N.C. 2010).  It "permits parties whose legal interests coincide to share privileged materials with one another in order to more

effectively prosecute or defend their claims." *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 277 (4th Cir. 2010) (citing *In re Grand Jury Subpoenas*, 902 F.2d at 248-49).

Pursuant to this rule, if the attorney-client privilege otherwise would protect a communication, and a third party who shared the client's legal interest was privy to the communication, the privilege is not waived. Epstein, *supra*, at 274-75; *see In re Grand Jury Investigations,* 918 F.2d 374, 386 n.20 (3d Cir. 1990) ("The presence of a third-party, such as a consultant does not destroy the attorney-client privilege where the party is the client's agent or possesses a "commonality of interest with the client.") (internal quotation marks omitted). For this exception to apply, it is "essential" that the client's and third party's "legal interests be fully allied." Epstein, *supra*, at 275; *see Neuberger Berman*, 230 F.R.D. at 416 (stating that sharing an attorney or even similar interests is not enough; "courts engage in a painstaking analysis to determine whether 'the third party ... shares an identical, and not merely similar, legal interest as the client with respect to the subject matter of the communication between the client and its attorney.'") (citation omitted); *Duplan Corp. v. Deering Milliken, Inc*., 397 F. Supp. 1146, 1172 (D.S.C. 1975) ("A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice. . . . The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial."). For the Court to apply this rule, "the proponent of the privilege must at least demonstrate that (1) the communicating parties shared an identical legal interest, (2) the communication was made in the course of and in furtherance of the joint legal effort, and (3) the privilege had not been waived." *Glynn v. EDO Corp*., 2010 WL 3294347 (D. Md. Aug. 20, 2010); *Mainstreet Collection*, 2010 WL 3945107, at *4 (same). Notably, circumstances in which parties share a common legal

interest "occur with considerable frequency in the area of patent law. Often, more than one party has an interest in some patent. Often, a single lawyer is used to protect that common interest." Epstein, *supra*, at 275. The privilege only can be waived by "consent of all parties who share the privilege." *In re Grand Jury Subpoenas*, 902 F.2d at 248.

It may be true that Vaught, Kratz, and Flo Pac, Vaught's employer at the time of the august 2006 meeting, shared a common legal interest in defending against potential litigation by Flow Design regarding the '317 Patent. However, Defendants' reliance on this exception to waiver of the attorney-client privilege is greatly misplaced. This is because, although two parties' joint communications with an attorney may be "'privileged from disclosure *at the instance of a third person*,'" the communications "'are not privileged in a controversy *between the original parties*, inasmuch as the common interest and employment forbade concealment from each other.'" Epstein, *supra*, at 274 (emphasis added) (quoting 8 Wigmore, Evidence § 2312 (1992)); *see Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1174 (D.S.C. 1975) (same); *In re Ducane Gas Grills, Inc.*, 320 B.R. 312, 323 (Bankr. D.S.C. 2004) "'[t]he common interest privilege does not apply between the clients if there is a falling out,'" which "occurs when there is adversary litigation between them") (quoting Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 213 (4th ed. 2001)). When two parties consult one attorney to protect a common interest and subsequent litigation commences between the parties, "both have a right to all communications either may have had with the attorney, as well as a right to the attorney's files." *Id.* at 275. Thus, "[w]here a single attorney does represent multiple clients, neither can assert privilege against the other in respect to a matter of common interest and representation." *Id.* at 282.

*In re Ducane Gas Grills, Inc.*, 320 B.R. 312, provides guidance. There, the plaintiffs had invented a specialty grill and assigned their interests in the grill to a company, Ducane, which then approached the law firm Nexsen Pruet about patenting the grill. *Id.* at 315. A Nexsen Pruet attorney spoke with plaintiffs to gather more information about the grill. *Id.* In its findings of fact, the court noted that plaintiffs did not receive an engagement letter or any bill from Nexsen Pruet, nor did they pay for Nexsen Pruet's services. *Id.* The court found, in contrast, that "Ducane specified and paid for Nexsen Pruet's services." *Id.* Thereafter, when litigation arose between the plaintiffs and Ducane's successor-in-interest, Weber, the plaintiffs sought to prevent Nexsen Pruet from representing Weber. *Id.* at 323. To this end, the plaintiffs claimed that "their disclosures to Nexsen Pruet, while Nexsen Pruet pursued a patent application for the [grill] on behalf of Ducane, gave rise to the attorney-client privilege," with Nexsen Pruet jointly representing the plaintiffs and Ducane with regard to their common legal interest. *Id.* The court concluded that plaintiffs failed to establish that Nexsen Pruet represented plaintiffs at all, let alone jointly with Ducane. *Id.* Moreover, the court noted that even if the firm had jointly represented plaintiffs and Ducane with regard to a common interest, because the plaintiffs and Weber, as Ducane's successor-in-interest, were involved as adversaries in litigation, plaintiffs could not "use the common interest doctrine to preclude disclosure of information shared with Ducane and preclude Nexsen Pruet from representing Weber." *Id.*

Here, Defendants failed to establish that they and Plaintiff both had attorney-client relationships with Gore at the time of the August 2006 meeting. Even if they had successfully demonstrated such relationships, the parties are now adversaries in the litigation underlying these motions. Therefore, the common interest rule would not prevent Plaintiff from discovering the communications that transpired at the August 2006 meeting. On the record before me,

Defendant failed to meet its burden of establishing every element of the attorney-client privilege through its alternative argument: Because it did not demonstrate that the common interest rule would apply, Defendant still has not shown that the communication was confidential. *See Jones*, 696 F.2d at 1072. Consequently, Defendant failed to establish the existence of the attorney-client privilege. Therefore, the communications from the August 2006 meeting are discoverable.

## IV.   CONCLUSION

Plaintiff's Motion to Compel is GRANTED. Plaintiff may continue its deposition of Vaught for up to two (2) hours, during which time Vaught will responsively answer questions pertaining to the disclosed communication and all communications on the same subject matter that ought in fairness be disclosed. *See* Fed. R. Evid. 502(a)(2)-(3). Information that does not pertain to the '317 Patent is outside the scope of this Order. Additionally, attorney Gore's opinion work product is not subject to discovery. *See* Fed. R. Civ. P. 26(b)(3)(B); *Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl. 480, 504-05 (2009) ("Federal Rule of Evidence 502(a) lacks any explicit language distinguishing between fact work product and opinion work product. However, . . . Federal Rule of Civil Procedure 26(b)(3)(B) . . . continue[s] to provide special protection for opinion work product . . . . Thus, when considering the fairness of granting a subject-matter waiver of work-product protection pursuant to . . . 502(a), the court must pay close attention to the special protection afforded opinion work product."); *Chick-fil-A v. ExxonMobil Corp.*, No. 08-61422-CIV, 2009 WL 3763032, at *7 (S.D. Fla. Nov. 10, 2009) (citing with approval *Eden Isle Marina*, and concluding that "rule 502 does not abrogate [governing Circuit authority] that 'the subject-matter waiver doctrine does not extend to materials protected by the opinion work product privilege'"). Failure to provide complete, responsive answers at the deposition may subject Vaught or Defendant to sanctions. *See* Fed. R.

Civ. P. 37(a)(4), (b)(2)(A), (c)(1). The deposition will be completed within thirty (30) days, unless the parties agree otherwise.

Each party will bear its own costs of briefing these motions. *See* Fed. R. Civ. P. 37(a)(5)(A)(ii).

At the November 23, 2010 hearing, Plaintiff's counsel also voiced concerns that when he deposed Gore, Defense counsel would object to his questions on the basis of privilege. At least two weeks prior to Gore's deposition, Plaintiff's counsel will inform Defense counsel about the questions he plans to ask at the deposition and explain why the questions are relevant and not privileged. If Defense counsel contends that any of the questions seek privileged information, then the parties will meet and confer about the questions. If a dispute still exists at the end of their meeting, the parties will outline the remaining dispute briefly in a letter to the Court, and the Court will set the matter in for a telephone hearing to rule on the dispute prior to the deposition.[6]

So ordered.


Dated: <u>December 9, 2010</u>                    <u>          /S/          </u>
                                                     Paul W. Grimm
                                                     United States Magistrate Judge


lyb

---

[6] I gratefully acknowledge the assistance of Melissa O'Toole-Loureiro, a University of Baltimore School of Law student who served as an intern in my Chambers this fall and significantly assisted in the factual analysis and research for this memorandum.